United States Court of Appeals
Fifth Circuit

**F I L E D**

**October 25, 2006**

Charles R. Fulbruge III
Clerk

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

No. 05-20177

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ARMANDO SANTOS,

Defendant-Appellant.

Appeal from the United States District Court
for the Southern District of Texas

(04-CR-27)

Before JONES, Chief Judge, SMITH,  and STEWART, Circuit Judges.

Per Curiam:[*]

This appeal arises from the criminal conviction of Armando Santos on the charges of conspiracy to possess with intent to distribute five kilograms or more of cocaine, 21 U.S.C. §§841(a)(1), 841(b)(1)(A)(ii), 846, and possession with intent to distribute 500 grams or more of cocaine, 21 U.S.C. §841(a)(1), 841(b)(1)(B)(ii).  The trial court sentenced Santos to 262 months of imprisonment on each count, the terms to run concurrently, and five-year terms of supervised release,

---

[*]Pursuant to 5th Cir. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Cir. R. 47.5.4.

also to run concurrently. The issues on appeal are whether the Government presented sufficient evidence to prove Santos guilty of conspiracy and whether the Government proved by a preponderance of the evidence that the Southern District of Texas was the proper venue for the offense of possession with intent to distribute. For the following reasons, we AFFIRM the trial court's conviction.

I. Factual Background and Procedural History

In November 2003, DEA Agent Schumacher learned from an informant that two men wanted transportation for eighty to one-hundred kilograms of cocaine from Houston to another state. On November 26, 2003, Shumacher met with "Gordo" Fernandez and Daniel Cortez at a restaurant in the Southern District of Texas. Schumacher offered to coordinate the transfer of the cocaine for Fernandez and Cortez in return for a monetary payment. Fernandez and Cortez agreed to pay Schumacher $790 per kilogram; and Schumacher agreed to transport eighty kilograms of cocaine. Fernandez and Cortez also informed Schumacher that a contact in Mexico possessed ten tons of cocaine and the men intended, in the future, to transfer additional cocaine throughout the East Coast and Florida.

On November 28, Schumacher met with the men a second time to take possession of the cocaine for transport to Atlanta, Georgia. Fernandez, Cortez, and Schumacher initially met at a Denny's Restaurant, in the Southern District of Texas. Schumacher then followed Fernandez and Cortez to a Cracker Barrel Restaurant in Baytown, also located in the Southern District of Texas. Schumacher received three duffel bags containing eighty kilograms of cocaine wrapped in brown squares. In the field, one of the squares tested positive for cocaine. After receiving the cocaine, Schumacher returned to the DEA office in Houston and placed the cocaine in the drug vault. The

2

next day, Fernandez and Cortez paid $20,000 to Schumacher as a down payment for his services. Schumacher also received a phone number to contract Fernandez and Cortez in Houston about the scheduled delivery in Atlanta.

The DEA office decided that Schumacher would transport only one kilogram of cocaine and seventy-nine kilograms of a non-cocaine substance. Before flying to Atlanta, Fernandez and Cortez gave Schumacher two phone numbers and the names of two persons, Ceus and Gorras, for Schumacher to contact upon arrival to Atlanta. Once in Atlanta, Schumacher met with other agents to discuss the drug delivery. Schumacher called Cortez to discuss the code words, "Santa Claus" and "I [Schumaker] had the toys." DEA Agent Spring Williams and Schumacher proceeded in a rental van with the drugs to the Atlanta Diner. Schumacher called the first phone number, given by Fernandez and Cortez, and the person identified himself as Ceus. Schumacher described himself to Ceus; and Ceus told Schumacher to look for a black Navigator at the diner. A black Navigator, driven by co-defendant Cesar Sanchez, approached the diner. Williams observed Sanchez and Santos in the vehicle. Schumacher told Sanchez the password, and then Sanchez introduced Santos to Williams and Schumacher. Schumacher identified Sanchez and Santos in court.

Sanchez informed Schumacher, inside the diner, that someone else would come to pick-up the cocaine. Gonzalo Castro later arrived at the diner and immediately engaged in a conversation with Sanchez and Santos. Sanchez, Castro, and Schumacher walked out of the diner to the van and viewed the three duffel bags. Schumacher opened each bag, pulled back the flaps, and displayed the bricks. Santos then left the diner and walked to the van, Schumacher again opened each bag, pulling back the flaps and displaying the bricks. Santos smiled and said that the cocaine was "beautiful." Schumacher testified that the men knew the bags contained cocaine.

3

Schumacher called Cortez, and Cortez spoke with Schumacher and Sanchez. After the phone conversation, Santos, Sanchez, and Castro wanted to move the cocaine into the tan Navigator, but Schumacher suggested that moving the drugs in the parking lot may appear too obvious. Instead, Castro left in the van, but Sanchez and Santos followed behind in the black Navigator. Schumacher then informed Sanchez that he completed the job and someone else would pick up the money.

Special Agent Williams, assigned to the Atlanta Field Division, worked the case with Schumacher. Although Detective Williams could not hear the telephone conversations, she confirmed the meeting with Schumacher, Sanchez, Santos, and Castro, as described by Schumacher's testimony. Williams also witnessed Santos viewing the cocaine in the duffel bag. When Castro left in the van, with Santos and Sanchez following behind the vehicle, Williams had already given a description of Santos and Sanchez to a surveillance team.

DEA Special Agent Juan Calvo participated in the surveillance at the Atlanta Diner, and testified at trial. Calvo followed the van and black Navigator away from the diner, and recognized when officers activated a kill switch on the van. He pulled over on the side of the highway, and noticed a county police officer pursuing the black Navigator. Shortly thereafter, the Navigator wrecked on an embankment near a Shell Station. Based on the description, Calvo recognized Santos at a nearby hotel and proceeded to attempt an arrest. Santos fled temporarily, and Calvo spotted Sanchez in the area. The officers apprehended Sanchez, and soon arrested Santos in the vicinity. Calvo identified Santos and Sanchez during the trial.

Pursuant to a stipulation of the parties, a forensic chemist analyzed the cocaine seized in Houston, Texas. The substance tested positive for the active ingredient of cocaine hydrochloride.

4

The 1000 grams of cocaine seized in Atlanta, GA, also tested positive for the active ingredient of cocaine hydrochloride.

After the Government rested its case, Santos and Sanchez moved for an instructed verdict of acquittal pursuant to Fed. R. Crim. P. 29. The defendants argued that venue was improper with respect to the possession count. The district court denied these motions. The defendants renewed the Rule 29 motions at the conclusion of their case. The district court again denied the Rule 29 motion. The jury found both defendants guilty as to each count. Santos filed a timely notice of appeal.

II.     Standard of Review

The standard of review for sufficiency of evidence is whether any reasonable trier of fact could have found that the evidence established guilt beyond a reasonable doubt. *United States v. Martinez*, 975 F.2d 159, 160-61 (5th Cir. 1992). The evidence, both direct and circumstantial, is viewed in the light most favorable to the jury's verdict. *United States v. Resio-Trejo*, 45 F.3d 907, 910 (5th Cir. 1995). This court reviews the denial of a motion for acquittal, under Fed. R. Crim. P. 29, de novo. *United States v. Guerrero*, 234 F.3d 259, 261 (5th Cir. 2000).

III.    Discussion

        A.

                1.

To establish a drug conspiracy, under §846, the Government must prove beyond a reasonable doubt that two or more persons agreed to violate federal narcotics laws, the defendant possessed knowledge of the conspiracy, and the defendant voluntarily participated in the conspiracy. *United States v. Gonzales*, 79 F.3d 413, 423 (5th Cir. 1996). A violation of 21 U.S.C. §841(a)(1) requires

5

a showing that the defendant, Santos, knowingly possessed a controlled substance with the intent to distribute same. *United States v. Miller*, 146 F.3d 274, 280 (5th Cir. 1998). Intent to distribute may be inferred from possession of a large amount of contraband. *United States v. Lopez*, 979 F.2d 1024, 1031 (5th Cir. 1992).

The agreement to conspire need not be express; the jury may infer its existence from circumstantial evidence. *United States v. Montgomery*, 210 F.3d 446, 449 (5th Cir. 2000). "A jury may find knowledgeable, voluntary participation from [a defendant's] presence when the presence is such that it would be unreasonable for anyone other than a knowledgeable participant to be present." *United States v. Paul*, 142 F.3d 836, 840 (5th Cir. 1998). An agreement to violate drug laws "may be inferred from concert of action" and "[k]nowledge of the conspiracy may be inferred from a collection of circumstances." *United States v. Payne*, 99 F.3d 1273, 1278 (5th Cir. 1996).

Evidence of a buyer-seller relationship, alone, provides insufficient support for a conspiracy conviction. *United States v. Casel*, 995 F.2d 1299, 1306 (5th Cir. 1993). However, evidence indicating both parties to the sale knew that the drugs were meant for resale is sufficient to establish a distribution conspiracy between the parties. *Casel*, 995 F.2d at 1306.

2.

Viewed in the light most favorable to the verdict, the evidence presented at the trial proves that Santos knowingly entered into an agreement to violate the federal narcotics laws by taking possession of a large amount of cocaine with the intent to distribute it in the Atlanta area. First, Fernandez and Cortez provided Schumacher with the name and phone number of the individuals accepting delivery of the drugs, in addition to providing code words recognizable by Sanchez. Sanchez and Santos arrived to the diner in the same vehicle. Sanchez's conversation with Fernandez,

6

during the transaction, indicated a joint participation in the scheme. Santos' reaction to the drugs, calling the cocaine squares "beautiful," supports his involvement.

Further evidence of an ongoing relationship between the Houston and Atlanta co-conspirators was that Schumacher received no payment of money from the Atlanta group in exchange for the cocaine. Instead, the Houston co-conspirators fronted drugs to the Atlanta individuals, which indicates an ongoing relationship of mutual trust and cooperation between these individuals rather than a one-time buyer-seller transaction. See *United States v. Posada-Rios*, 158 F.3d 832, 860 (5th Cir. 1998) (reasoning that drugs purchased on consignment serves as strong evidence of membership in a conspiracy because it demonstrates a strong level of trust and a mutually dependent relationship). The large amount of drugs indicated that all parties involved knew that the cocaine was intended for resale in the Atlanta area. *Casel*, 995 F.2d at 1306; *United States v. Kates*, 174 F.3d 580, 582 (5th Cir. 1999) (holding that an intent to distribute can be inferred from the possession of a quantity of drugs too large for personal use). Moreover, Santos and Sanchez immediately exited the black Navigator when the van stopped, retrieved the duffel bags from the van, and fled the scene, which remains consistent with a conspiracy theory. For these reasons, we affirm the conspiracy conviction based on the evidence presented at trial.

B.

1.

Under federal law, a defendant is entitled to be tried in the district court where the crime occurred. *United States v. Carreon-Palacio*, 267 F.3d 381, 390 (5th Cir. 2001). The prosecution bears the burden of proving venue as an element of the offense, but "[t]he prosecution need only show the propriety of venue by a preponderance of the evidence, not beyond a reasonable doubt."

7

*Id.* at 390-91. In reviewing a jury determination concerning venue, the appellate court must view the evidence in the light most favorable to the Government, making all reasonable inferences and credibility choices in favor of the jury's verdict. *United States v. Davis*, 666, F.2d 195, 199 (5th Cir. 1982). A defendant may waive his objection to venue if he fails to raise the issue before trial. *Carreon-Palacio*, 267 F.3d at 391. However, the issue is not waived if the trial testimony puts venue at issue, and the defendant objects or requests an instruction. *Id.* at 392.

> 2.

At the close of the Government's case, in connection with the Rule 29 motion, counsel for Santos asserted that the Government carried a higher burden of proof than preponderance of the evidence in light of the *Apprendi* decision. *Apprendi v. New Jersey*, 530 U.S. 466, 471 (2000). Defense counsel also requested a jury instruction on venue. *Id.* The district court denied the Rule 29 relief, but stated that an instruction would be given to the jury on venue. *Id.* at 479. Santos argues that the preponderance of the evidence did not show that venue was proper with respect to count three of the indictment which charged in pertinent part that:

> On or about December 1, 2003, in the Houston Division of the Southern District of Texas, and else where, CESAR SANCHEZ, ARMANDO SANTOS, AND GONZALO ALCANTARA CASTRO defendants herein, each aiding and abetting the other, did unlawfully and knowingly possess with the intent to distribute a controlled substance. The violation involved 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance.

According to the venue statute, "when an offense is begun in one district and completed in another, venue is proper in any district in which the offense was begun, continued, or completed," and "venue is properly based on a preponderance of the evidence showing the commission of any single act that was part of the beginning, continuation, or completion of the crime." *United States*

8

*v. Solis*, 299 F.3d 420, 444 (5th Cir. 2002) (citing *United States v. Fells*, 78 F.3d 168, 170 (5th Cir. 1996) and 18 U.S.C. §3237(a)).  Possession with intent to distribute falls under this venue statute because it is a continuing-offense crime.  *United States v. Davis*, 666 F.2d 195, 199 (5th Cir. Unit B 1982).  Under Count 3, Santos did not possess with intent to distribute, nor aid and abet anyone possessing with the intent to distribute, in the Southern District of Texas, but that district is a proper venue because the process of Santos's illegal conduct began there.  *See United States v. Uribe*, 890 F.2d 554, 559 (1st Cir. 1989) (holding that even though a defendant charged with possession with intent to distribute did not ever possess drugs in the venue, the venue was proper because the process of the defendant's wrongdoing began there).  The evidence presented against Santos shows that the cocaine originated in the Southern District of Texas before arriving in the Middle District of Georgia for delivery to Santos, Sanchez, and Castro.  For this reason, the Southern District of Texas was a proper venue for the charge of possession with intent to distribute against Santos.

IV.    Conclusion

Based on the evidence presented at trial, we find that the jury properly convicted Santos of conspiracy to possess with intent to distribute and possession with intent to distribute.  Accordingly, we AFFIRM the trial court's conviction.